[No. 21322. Department One. November 26, 1928.]

BERTHA PETERSEN *et al., Respondents,* v. SEATTLE
AUTOMOBILE COMPANY, INCORPORATED, *Appel-
lant,* C. K. ANDERSON, *Defendant.*

W. A. SIMMONDS *et al., Respondents,* v. SEATTLE AUTO-
MOBILE COMPANY, INCORPORATED, *Appellant,*
C. K. ANDERSON, *Defendant.*[1]

*Reynolds, Ballinger & Hutson,* for appellant.
*John F. Dore* and *F. C. Reagan,* for respondents.

TOLMAN, J.—Two separate actions were instituted
by different plaintiffs against the same defendants to
recover damages suffered in an automobile collision.
These actions were consolidated for the purpose of the

[1]Reported in 271 Pac. 1001.

trial below, and a jury rendered separate verdicts, one in favor of each set of plaintiffs and against the defendant Seattle Automobile Company only. Judgments were entered on the verdicts, and the Seattle Automobile Company has appealed, the cases being now consolidated for the purpose of this appeal.

The errors assigned raise only questions as to instructions given and refused. As to the instructions given, it seems to be conceded that they were excepted to only because they are inconsistent with the theory of the requested instructions which were refused, and if we should find that the requested instructions were improper, then there will be no necessity for discussing the errors assigned upon instructions given.

To make the situation plain, we first quote sufficient of the refused requests to present clearly appellant's position:

"The latent defect of an automobile is one which is hidden and unknown and which would not be discovered by ordinary and reasonable inspection. If the accident involved in this case was caused by such a defect and said defect was unknown to Seattle Automobile Company and to its employee, Holden, you cannot find a verdict against defendant Seattle Automobile Company."

"One who is intrusted with an automobile not his own, to be driven by him on a temporary occasion, is not bound to make any inspection of it to ascertain whether it is safe to be used upon the streets, in the absence of some knowledge on his part, or notice to him, that the same may be defective. He has the right to assume, in the absence of knowledge or notice to the contrary, that it is safe to be driven upon the streets; and he is not responsible for an accident occurring while he is driving it by reason of a defect in the automobile not so known to him, and of which he has no notice at such time prior to the happening of the accident as would enable him to take precautions against an accident of that character. Therefore, if you find that the automobile belonging to the defendant An-

derson was entrusted to Holden as agent of defendant Seattle Automobile Company for a temporary purpose, and that said Holden had no knowledge or notice that said automobile was in any manner defective, then Holden was under no obligation to inspect or examine said automobile but was entitled to assume and act upon the assumption that it was safe, with reasonable care, to drive said automobile on the streets; and if you further find from the evidence that said automobile, without knowledge or notice to said Holden, was, in fact, defective or while being driven by said Holden without any negligence upon his part became defective, and that when said defect was discovered by him, if it was discovered, said Holden could not by the exercise of reasonable care prevent the accident involved in this case, and that said accident occurred by reason of such defective condition of said automobile, if it was defective, and not by reason of any negligence upon the part of said Holden, your verdict must be in favor of the defendant Seattle Automobile Company.''

''The automobile driven by Holden, the agent of the defendant Seattle Automobile Company, not belonging to said defendant nor said driver, neither said defendant nor said driver had any duty to make said automobile fit and safe for use upon the streets. If said automobile, in fact was defective and unsafe to be driven on the streets and said defendant or Holden had knowledge or notice thereof it would be negligent to drive said automobile on the streets, but in the absence of such knowledge or notice, it would not be negligence on the part of said defendant or said Holden for Holden to drive said car upon the streets in the usual way and in the exercise of reasonable care.''

''You are instructed that if a latent defect existed in the car driven by Holden, which was unknown to him at the time of the accident or at a time sufficiently near thereto that he could take precautions against the happening of the accident under investigation, and that said latent defect was the sole and proximate cause of the accident in controversy, you cannot find a verdict against the Seattle Automobile Company.''

''You are instructed that by common acceptation, an unavoidable or inevitable accident means a casualty

which happens when all the means which common prudence suggests have been used to prevent it; and if you find from the evidence in this case that the brakes of the car driven by J. H. Holden suddenly gave way so that he could not operate or control the car, and that said Holden was guilty of no negligence, and that the accident complained of was the direct and proximate result of the giving way of said brakes, and that said Holden, by the exercise of reasonable care, could not prevent the giving way of said brakes or the collision which resulted in injury to said plaintiffs, then your verdict must be for the defendant, Seattle Automobile Company."

Defendant Anderson was the owner of the Oakland car which the jury found caused the damage. Contemplating the purchase of a new car from the appellant, Anderson had intrusted his car to an employee of appellent to drive it to appellant's place of business for the purpose of examination and the appraisal of its turn-in value. The car apparently had been so examined, and appellant's employee was returning it to Anderson's garage, when he descended a steep grade and passed into an arterial highway, without stopping before such entry as the city ordinance requires, at a high rate of speed, crashing into the car occupied by respondents.

J. H. Holden, the driver of the Oakland touring car at the time of the accident testified:

"I went down the first hill, and everything was holding all right, otherwise I would have turned to stop, but I went down the second hill and I was actually over halfway down; there is a V that turns off, and I just got beyond that . . . the first thing I realized was that the only thing that was holding me back was my motor, as Mr. Bell stated, a car on a hill of that kind, an Oakland touring car of that year is not very heavy, and the motor will hold it down to a pretty reasonable speed. I probably agree with him that you probably could go down if you didn't meet anybody at the bot-

tom, the whole way, without brakes, and not attain a speed of possibly more than twenty miles an hour. I suddenly realized that there was nothing holding me but my motor.''

and on cross-examination:

''Q. You say, in coming down this second hill, you realized that the engine was the only thing that was holding; what gave you that impression? A. Naturally preparing to come to a stop at the bottom of the hill, because there is always a lot of traffic on Eastlake. Q. Were you trying to operate your foot or the emergency brake? A. I tried to operate my foot brake first. Q. Did you operate the emergency brake? A. I pulled it back, yes.''

An automobile mechanic called on behalf of the appellant testified as follows:

''Q. Did you notice anything in the car that would cause the brakes to be inoperative? A. Yes, sir; by the motor dropping, letting it down, letting your motor drop and you have no brake, not any brake being connected onto the motor, which would make a difference in the adjustment. Q. In other words, the break in the motor leg? A. Would make a difference in your brakes. Q. That would result in inoperative condition of the brakes? A. Yes. Q. Could a person have full control of a car with the brakes becoming inoperative? A. No, sir, not on a hill.''

On cross-examination the same witness testified:

''Q. That break in that piece of iron that was holding up the engine might have been caused by this Oakland car hitting the Studebaker at the bottom of the hill, might it not? A. It might have. Q. In other words, when those two cars came into collision, at the bottom of the hill, that is what might have caused that break? A. It might have. Q. It would be a very likely thing to happen? A. It could happen, yes. Q. It would be a very probable thing when that car came down the hill and hit the Studebaker coming down the hill fast enough to turn it over, that something would break, isn't that true? A. Yes.''

And on re-direct examination the same witness testified:

"Q. Assuming that the brakes gave way about half way up the hill, and assuming that Mr. Holden's statement, that they did give way, is true, what would you say then with reference to where the new break occurred, what would be your judgment? A. I would say that the strain of the brake, their extra strain on the motor leg which supports the foot pedal, the emergency brake, which would let your motor get twisted and break that. Q. In other words, that would let it down so that the brakes would not operate? A. Yes."

On re-cross-examination he further testified:

"Q. Now, do I understand your claim is that this photograph is not correct, that the break was clear across instead of just half way across? A. I withdraw that statement; instead of being clear across, there is a piece bent back on this part here that was not broke. Q. There was a portion of it that was not broke? A. Yes, sir; it was bent. Q. As a matter of fact, the motor leg, was, after the accident, and including the new break, was really just broken about half way across? A. No, that was broke over half way. Q. You think it was broken over half way? A. Yes. . . . Q. All you know was that a portion of the break was new and right after the accident, it was bright like this, but whether it was all made there beforehand, that that cracked in two, you don't know? A. I could not say. Q. There is not any sagging of the hanger that is shown, of any kind, is there? A. It does not show in the picture. Q. Now, it is your theory, as I understand it, that this break was the cause of the brakes being in the condition that you found them after the accident? Mr. Dore: I think this theory is immaterial. Mr. Turner: His opinion has been asked. The Witness: I said it might have been. Q. You would not want to say it was so or was not so, would you? A. No. Q. As a matter of fact, this hanger is something that hangs the engine to the frame is it? A. Yes, sir. Q. It is not connected up at all with the brake system, is it? A. The engine is connected with the brakes. Q. There are four of those hangers, aren't

there, on a car? A. Two, one on each side, in back, and one in front,—three; there are only two of them. Q. One in front—there are three? A. One in front—there are three. Q. One in front of the car and this one on the right-hand side at the back? A. Yes. Q. As I understand after this accident and this car had been smashed up, the brakes were out of shape and you found this particular break and you thought it might have caused it, but you would not say it did, that is your attitude? A. Yes, it might."

Another experienced automotive engineer called by the defendant testified as to an examination made after the accident as follows:

"Q. I will ask you to state what was the condition of the brakes at the time you made the examination. A. When I put the car up on jacks to test the brakes, the brakes were in reasonably good operating shape. Q. Was there anything in the brakes or in the condition of the car that would show or cause the brakes to be inoperative, prior to the time that you saw it? A. Yes, sir. There was a condition that might have caused it to be inoperative. Q. What was the condition? A. This particular break just shown in this rear engine hanger. Q. Explain to the jury exactly how that could be brought about, how it would cause the brakes to be inoperative. A. It is pretty hard to do without the aid of a blackboard. I think I might be able to state it this way: There are two fixed parts on the car, fixed in longitudinal alignment, to which the brakes are attached; one is the rear axle and the other one is the engine and transmission case. The forward part of the brake, the part which you apply with your foot, is fastened to the transmission case. It is an integral part or continuitary part of the engine. The hand brake is also fastened on the case; so it is fastened to become an integral part of the engine,— anything that might cause the distance to be shortened between the rear of the engine hanger and the axle, if that would be shortened, would allow the brakes to become inoperative, anything that would cause those to lengthen would naturally cause them to be tighter

than it was previously,—in other words, the distance between the engine hanger and the rear axle is a vital part of the brake mechanism, anything that causes that distance to become changed, either longer or shorter, alterates the right condition of the brakes. I think that answers your question. . . . A. I understand the question is the brakes were inoperative, to what might that be attributed? Q. That is the idea exactly, what would cause it? A. Anything, as I said a moment ago in my statement, anything which will shorten the distance between the engine and the rear axle will make those brakes inoperative. Q. What I want to know is whether that exact condition that you saw on it would result in this failure to hold. A. This particular condition shown in here, this break in the rear engine hanger would allow the engine to move a small degree forward and backward. Of course it would bend this metal and it would require a considerable amount of free movement, to make it move about, and it could move and the fact that the engine could move, would allow the brakes to become inoperative.''

On cross-examination he further testified:

''Q. As I understand you to say, that this might have caused the brakes to become inoperative? A. Yes. Q. You would not feel justified in going so far as to say that it would necessarily do it. You say it could move? A. I don't know what you mean by 'move'. Q. That was the word you used. A. I was answering a specific question. I want to know what you are asking me right now, so I will give you a specific answer. Q. What I want to know is this: assuming the same state of facts that was assumed in his question, that the brakes were found inoperative at the accident and after the accident also you found this condition in the car shown by break in the motor leg? A. Yes, sir. Q. Could you say that it was the cause of the brakes being inoperative, or simply that it might have been? A. It would all depend upon whether the break in the motor leg had allowed the engine to go forward and backward. The position of the engine is the thing that determines whether the brakes become

inoperative or not, not the fact of the break. . . .
Q. Did you examine the other hangers? A. Yes, sir. Q.
Were they in good condition? A. I didn't see anything
serious the matter with them. The brakes were not
100 per cent efficient, but they were in reasonably fair
shape. Q. So far as you could testify, Mr. Taylor,
with the break in the motor hanger, which is the old
part of it, the brakes might have held, the brakes on
that car might have worked entirely efficient? A. I
would say they may have; I would not want to make
a specific division as to where they would not work,
because I do not know.''

The manner of attaching the motor to the frame of
an Oakland car is definitely explained by a witness
produced on behalf of defendant Anderson who testi-
fied as follows:

''A. All Oakland make of cars have a third sus-
pension. It has two bearings on the back and one in
the front. The two bearings is hung, fastened to what
we call the second cross member of the frame. The
motor is fastened with what we call an 'L' that bolts up
against the frame and turns and bolts back again. This
is the third member. Then the second member is a part
of the 'L' also. The motor sets upon this cross mem-
ber. This 'L' as put on there is merely put there to
hold the motor in line with the frame. If that was to
bend, to break at any time, the motor would still stay
in line. It could not drop down. When we take the
motor out of the frame, we have to put it on a hoist,
and it is quite difficult to raise the motor out of the
frame to get it out of there; it will not drop down, be-
cause it still sets on the cross member. If that piece
was to break at any time the motor would still be in
line with the frame and it would have no connections
with throwing the brakes out of line. All three sup-
ports would have to break to throw the brakes out of
line at all. If that was to break the motor could not
move one sixteenth of an inch backward or forward,
because the front support of the motor is fastened with
two 5/8's bolts through the front cross member and
that break would give us no cause for the motor to slip

backward or forward in any way. If the motor was to drop down, say it would drop down, it would throw the brakes on instead of throwing them off.''

The same witness on re-direct examination, in explanation of the testimony in the case with reference to the car being moved by pushing with the brake set, after the accident, testified as follows:

''Q. I will ask you whether or not the condition of the brakes afterwards, whatever the condition was, may not have been caused by the accident in the wreck rather than any trouble before? A. The way the car is now after the wreck, why the frame is bent all out of shape and naturally the brakes would not be in condition.''

None of this testimony was specifically denied and there is much more in the record which corroborates it.

█ In other words, we have here a motor sitting upon and within a rigid steel frame and bolted thereto by three hangers or motor legs, each of rigid construction, one in front and one on each side at the rear. The breaking, or breaking and bending, of only one of these hangers, and that a rear one, could not, unless all physical laws have been repealed, have permitted the motor to drop through the solid steel frame upon which it rested, and could not have permitted the motor to move on the steel frame toward the rear, without breaking, or at least bending, the other two hangers. So far as any witness attempts to say, the braking power could only be affected unfavorably by the motor moving toward the rear, thus loosening the brakes, and since the physical facts show that such movement did not and could not have occurred, we have nothing in the way of evidence which would have justified an instruction on latent defects.

█ Moreover, there is no evidence that the break in the motor leg or hanger occurred before the acci-

dent happened, and so little upon which to base an inference that it did so break, that the jury would have been obliged to indulge in pure speculation to so find, but even if the jury was permitted to draw the inference that the hanger broke while the car descended the hill just prior to the accident, it could not be permitted to base an inference on such an inference. Having inferred that the hanger so broke, through pure speculation, it could not therefrom draw the inference that the motor, because of the breaking, moved toward the rear and so loosened the brakes as to cause them to become inoperative.

"It is frequently laid down as a general proposition or rule that an inference cannot be founded on an inference or drawn from another inference. Such statements must, however, be received with caution. Analysis of any step of reasoning almost invariably shows it to be complex or compound rather than simple. Until the chances of error are eliminated in one inference, it forms an unsound foundation for a second inference; but once the chances of error are removed the process of reasoning upon inference becomes not only safe but also the common mode of reaching conclusions." Jones Commentaries on Evidence (2nd ed.), Vol. 1, § 11.

So here, the chances of error in the first inference of the breaking of the hanger before the accident were never eliminated; therefore it is an unsound foundation upon which to base a second inference.

There was no sufficient basis in the evidence to justify the giving of an instruction on latent defects, even if it be conceded that such an instruction may be given in a proper case. That question will be reserved for consideration when based upon substantial evidence.

██ The facts as already outlined also plainly call for the rejection of the second of the quoted requested instructions, because it clearly appears that the automobile brakes were not defective when the car was in-

trusted to the driver Holden, and, in any event, we think one who undertakes to drive an automobile on the public streets and highways must be charged with notice of everything that a reasonable inspection would disclose, whether the car belongs to him, or to another and is loaned or rented to him for the occasion.

Finding no error, both judgments are affirmed.

FULLERTON, C. J., MITCHELL, MAIN, and ASKREN, JJ., concur.